■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HEATH STROTHERS, Appellant. [928 NYS2d 28]—

At the time of his arrest, defendant was the driver of a black Jeep. The two passengers in the vehicle were codefendants Jose Concepcion and Edwin Reyes. For the previous two months, Concepcion had been under surveillance by a 14-member team

of the New York Drug Enforcement Task Force, which had secured wiretaps on several cell phones used by Concepcion. Reyes was one of the people identified through the wiretaps, but defendant was not. The Task Force had concluded that the people on the cell phone conversations were members of a large-scale drug-trafficking operation. Indeed, approximately two months prior to defendant's arrest, based on information procured from the wiretap, the team stopped a tractor trailer in Rockland County, New York, and seized $1,355,860 in cash.

In the hours prior to defendant's arrest, the Task Force listened to cell phone conversations between Concepcion and others and realized that a transaction was planned for 12:30 A.M. the next morning in the Hunts Point section of the Bronx. Based on this, the agents anticipated that a tractor trailer containing 50 kilos of cocaine would exit I-87 at Exit 1 and that Concepcion would be there to meet it. The Task Force staked out the Hunts Point neighborhood, and, continuing to monitor calls made from Concepcion's cell phone, spotted the tractor trailer and the Jeep, both of which they pulled over. Defendant and his passengers were immediately arrested. The agents seized five cell phones from the Jeep, including the one that they had been monitoring. They also seized $2,220 in cash from defendant, as well as automobile insurance and registration in the name of defendant's wife.

Defendant moved to suppress the evidence seized from him based on what he contended was lack of probable cause to arrest him. The court conducted a joint *Mapp/Dunaway/Huntley* hearing which also addressed the suppression motions of Reyes and another codefendant, Elvin Concepcion. The hearing commenced with the testimony of Special Agent Jarod Forget of the Drug Enforcement Agency, who led the Task Force that had arrested defendant. At the moment Forget began testifying, defendant's counsel was not present. Instead, he was covering an appearance in another county. Although the court was aware of counsel's absence, and that defendant would be unrepresented, it ordered the hearing to proceed. More than halfway through Agent Forget's direct testimony, defendant's counsel appeared and apologized for his tardiness. To that point, Agent Forget's direct testimony had covered personal background information, general information concerning how wiretap surveillance is conducted, and some specific information regarding the events in question. Defendant's counsel was able to conduct a cross-examination of Agent Forget, and he was present for the testimony of both of the People's other witnesses, who were also on the scene at the time of defendant's arrest.

The court denied the suppression motion. It found that all three of the witnesses were credible and that they established probable cause for defendant's arrest. Defendant proceeded to trial. In addition to the items seized from the Jeep, the People introduced evidence discovered during the investigation subsequent to the arrests. This included an American Express bill belonging to Concepcion which revealed that, after the Task Force had seized cash from the tractor trailer in Rockland County, Concepcion had paid for two round-trip airline tickets for himself and defendant from New York to Orlando, Florida. The bill further led the agents to learn that Concepcion rented a car in Orlando, and drove it 2,130 miles in three days. Furthermore, telephone records showed that one of the cell phones found in the Jeep, which was owned by Concepcion but had not been tapped, established that defendant and Concepcion had called one another over 330 times.

The right to counsel for an accused person is constitutionally guaranteed at trial and at other critical proceedings such as a pretrial suppression hearing (see People v Carracedo, 214 AD2d 404 [1995]). The deprivation of counsel has been described as absolute and harmful per se (see People v Margan, 157 AD2d 64, 65-66 [1990]). Because of the sanctity of the right to counsel, we need not engage in an analysis as to what transpired in the case during counsel's absence and whether the evidence received, or matters discussed with the court, were material to the defense. " 'The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial' " (id. at 66, quoting Glasser v United States, 315 US 60, 76 [1942]). Thus, we reject the People's argument that the deprivation here can be overlooked because defendant was unrepresented for only a small portion of the cumulative testimony and that the portion counsel missed covered only background and general information.

The fact that the right to counsel is absolute also renders baseless several of the other arguments advanced by the People. For instance, it is of no moment that counsel, once he did arrive for the hearing, did not preserve the objection that it began without him. Where counsel is not present when the deprivation occurs and so cannot lodge an objection, the issue can be raised for the first time on appeal (Margan at 70). The People offer no support for their position that the presence of code-fendants' counsel, whose clients' interests they allege were aligned with defendant's, was an adequate substitute. Evidence that defendant expressly agreed to the representation and

waived any conflict, as would be required, is completely absent from this record (*cf. People v Torres*, 224 AD2d 269, 270 [1996], *lv denied* 88 NY2d 943 [1996]).

We also reject the People's contention that the deprivation of counsel here was harmless. The Court of Appeals has held that, where a defendant is deprived of counsel at a suppression hearing, the error cannot be deemed harmless even if one can conclude that the outcome of the hearing would have been the same had counsel been present (*see People v Wardlaw*, 6 NY3d 556, 559 [2006]). In *Wardlaw*, the Court of Appeals did state that it is relevant to consider "what impact, if any, the tainted proceeding had on the case *as a whole*" (*id.* [emphasis added]). However, in holding that the deprivation of counsel in *Wardlaw* was harmless, the Court emphasized the "truly overwhelming" evidence of the defendant's guilt of a rape charge, which was DNA recovered from semen found in the victim's vagina (*id.* at 560). Here, evidence of defendant's guilt is much more equivocal. Assuming that defendant would have prevailed at the suppression hearing, the evidence recovered from Concepcion after defendant's arrest linking defendant to the drug transaction at issue would be circumstantial. The facts that defendant traveled with Concepcion and had multiple telephone conversations with him do not, by themselves, establish his participation, much less constitute "truly overwhelming" evidence of guilt (*id.*).

The dissent asserts that we "conflate[ ]" the deprivation of counsel at a pretrial hearing with the deprivation of counsel at trial. We do no such thing. The result reached here is consistent with how the Court of Appeals has treated the former situation in that we have not reversed defendant's conviction, as is done in the latter, but merely ordered a new suppression hearing. The dissent acknowledges that this is the appropriate remedy, and we do not disagree that there is an exception for cases in which there is "truly overwhelming" evidence of guilt (*id.*). However, we strongly disagree with the dissent's view that, even without the seized evidence which was the subject of the suppression hearing, "it is beyond reasonable doubt" that defendant would have been convicted, to say nothing of whether the evidence reaches the *Wardlaw* standard. While it may be possible to infer from the remaining evidence that defendant and Concepcion had a business relationship, it cannot be said, as it must in a case involving circumstantial evidence only, that the evidence would have "exclude[d] to a moral certainty" the possibility that defendant was not a participant in the drug transaction at issue here (*People v Barnes*, 50 NY2d 375, 380 [1980] [internal quotation marks omitted]).

The dissent's arguments that defendant's failure to preserve his objection to the absence of counsel is fatal, or alternatively, that he was not deprived of counsel at all, also fall flat. Regarding the former issue, the dissent relies on *People v Narayan* (54 NY2d 106 [1981]). In that case, the Court of Appeals held that the defendant failed to preserve an objection to the trial court's having prohibited defense counsel from conferring with his client concerning the testimony the defendant had offered that day in court. However, that was because, as the Court stated, "[A]n objection voiced by counsel . . . *when the trial court first uttered its prohibition against consultation between attorney and client*, might well have resulted in a change of the Trial Judge's ruling and total avoidance of interference with defendant's constitutional claim" (54 NY2d at 113 [emphasis added]). Here, defense counsel was obviously not in a position to voice an objection when the trial court decided to proceed without him. Moreover, even if, as the dissent theorizes, *Narayan* could be read to require a lawyer who has missed part of a proceeding to object when he finally arrives in court, such a rule would not apply under the circumstances of this case. The dissent's surmise that the court may have restarted the hearing or allowed readback of the testimony is not consistent with the court's refusal to wait for defense counsel to begin the hearing, even after the prosecutor asked the court, "[D]on't we need to wait for [counsel] . . . [b]ecause the Dunaway does pertain to him?"

Further, the dissent's position that defendant "was not unrepresented for testimony appertaining to him" is simply inaccurate. *All* of the testimony that counsel missed related to defendant because it was elicited by the People for the purpose of establishing that, even if only in general terms, the police employed proper procedures and techniques in developing probable cause to arrest defendants. Again, given the fundamental nature of the right to counsel, it is not for us to separate out the testimony that was truly pertinent to defendant from that which one could argue was not important enough to require that counsel be there to hear it (*see People v Margan*, 157 AD2d at 66). In addition, it is impossible for us to determine whether testimony elicited before counsel arrived could have been used by him as fodder for effective cross-examination that would have changed the outcome of the proceeding for his client.

For all of the foregoing reasons, the court's decision to proceed with the suppression hearing in the absence of defendant's counsel was a fundamental error that entitles defendant to a new hearing. Concur—Mazzarelli, J.P., Moskowitz and Román, JJ.

Andrias and Catterson, JJ., dissent in a memorandum by Catterson, J., as follows: I must respectfully dissent. In my opinion, remanding for a de novo suppression hearing is unwarranted because (a) the defendant did not preserve the issue of the alleged pretrial violation of his right to counsel; (b) he effectively was accorded a de novo hearing when his attorney eventually arrived in the courtroom; and (c) the alleged deprivation was harmless error. In my view, suppression of the evidence recovered from the stop could not have prevented the jury from reaching a guilty verdict.

The defendant was arrested after driving his black Jeep to a drug transaction at Hunts Point Market in the Bronx in April 2007. The transaction involved 50 kilos of cocaine for a purchase price of approximately $1.2 million. Two passengers in the Jeep were codefendants, Jose Concepcion and Edwin Reyes who were the subjects of a wiretap investigation by a drug enforcement task force. As a result of intercepted communications and surveillance which led the task force to the location of a drug transaction, the task force arrested the defendant, his two passengers, the driver of a tractor trailer carrying the cocaine, and the driver of a white van carrying more than $1 million in cash.

The defendant was charged, inter alia, with conspiracy in the second degree (Penal Law § 105.15) and criminal possession of a controlled substance in the first and third degrees (Penal Law § 220.21 [1]; § 220.16 [1]). He moved to challenge the probable cause for the stop of his Jeep, and to suppress property owned by him and recovered from his person and from the Jeep at a joint hearing with codefendant Reyes. The challenged property included cell phones, $2,220 in cash, and the registration and auto insurance documents in the name of defendant's wife. He also moved to suppress a statement he made to the lead investigator of the task force.

When the defendant's attorney disobeyed the court's order to appear for the hearing at 9:30 A.M., the court allowed the hearing to start without defense counsel. Codefendant Reyes was present with two attorneys when the prosecutor called the first witness, Jarod Forget, a special agent and the lead investigator on the case. Subsequently, the court denied the defendants' motions for suppression, Reyes and Concepcion pleaded guilty, and the defendant was convicted after a jury trial. He now appeals on the grounds that inter alia his fundamental right to counsel at the suppression hearing was violated, and he is therefore entitled to a de novo suppression hearing.

As a threshold matter, I believe the majority's holding is based on an analysis that conflates two distinct concepts in criminal

law: a defendant's fundamental right to a fair trial and a defendant's right to counsel at pretrial proceedings. Thus, the majority reaches the conclusion that a "fundamental error" occurred. The majority's references to the "sanctity" of the right to counsel rely on Second Department case law (*People v Margan*, 157 AD2d 64 [1990]), which in turn cites to the legal authority of the United States Supreme Court (*Glasser v United States*, 315 US 60 [1942]). The majority therefore reiterates that the right to counsel is "constitutionally guaranteed;" that deprivation of counsel is "harmful per se;" and thus, that the right is "too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." (*Glasser*, 315 US at 76.)

These observations, however, have nothing to do with the issue before us. In its seminal cases on a defendant's right to counsel, the Court of Appeals has drawn a clear distinction between those instances where deprivation of counsel is an error "so serious" that it operates to deny a defendant's fundamental right to a fair trial (*People v Hilliard*, 73 NY2d 584, 586-587 [1989]), and those cases where a defendant is denied the assistance of counsel in a pretrial proceeding, specifically a suppression hearing. (*See People v Wardlaw*, 6 NY3d 556 [2006]; *People v Carracedo*, 89 NY2d 1059 [1997]; *People v Slaughter*, 78 NY2d 485 [1991].) In the former line of cases, convictions are reversed and new trials granted without a court enunciating whether the error contributed to conviction. (*See Hilliard*, 73 NY2d at 586, citing *People v Crimmins*, 36 NY2d 230, 238 [1975]; *People v Felder*, 47 NY2d 287 [1979].) In the latter line of cases, deprivation of counsel does not always mandate such a remedy.

In *Wardlaw*, the Court held that the right to counsel is "indeed very important" but that "deprivations of important constitutional rights do not require a remedy when it is clear beyond reasonable doubt that they did not contribute to a conviction. There are rare exceptions, when a defendant has been denied his fundamental right to a fair trial, *but a violation of the right to counsel at a pretrial hearing is not among them*." (*Wardlaw*, 6 NY3d at 561 [internal quotation marks and citations omitted; emphasis added].)

The *Wardlaw* Court observed that, "ordinarily" the remedy for such a violation at a suppression hearing requires a remand for a de novo hearing, and a new trial *only if* a de novo suppression hearing results in a finding that the evidence should have been suppressed. (*Wardlaw*, 6 NY3d at 559.) However, the Court dispensed with automatic remand for a de novo hearing where "it is clear, beyond reasonable doubt, that the outcome of the

suppression hearing [at which the violation occurred] could not have affected the outcome of the trial." (*Wardlaw*, 6 NY3d at 558.) Thus, the Court held that deprivation of counsel at a pretrial hearing was subject to a harmless error analysis. (*Id.* at 559 [remedy to which a defendant is entitled depends on what impact if any, the tainted proceeding had on the case as a whole], citing *People v Wicks*, 76 NY2d 128 [1990] [harmless error analysis applicable where defendant was not provided counsel at a preliminary hearing].)

Moreover, while not "depreciating the stature of the constitutionally protected right of a criminal defendant effectively to confer with counsel," the Court also has found that there are occasions when the violation of a right to counsel requires an objection by defendant to preserve the issue for appellate review. (*People v Narayan*, 54 NY2d 106, 112 [1981] [where defense counsel was ordered not to communicate with defendant while the defendant was testifying at trial].) The Court stated, "[W]e find no justification for departing from the requirement that trial court error (here interference with [right to counsel]) must be brought to the court's attention by protest timely made, at least where counsel acting on defendant's behalf is present and available to register a protest *and where the error if called to the court's attention is readily susceptible to effective remedy*." (*Narayan*, 54 NY2d at 112 [emphasis added].)

Initially then, I dissent from the majority view that preservation is not required in this case. The majority relies on *Margan* (157 AD2d at 70) which distinguishes *Narayan* as standing for the oxymoronic-like proposition that counsel has to be "actually present" at the time an erroneous ruling respecting right to counsel is made in order to object for the record. In *Margan*, the People commenced the direct examination of the first State witness at trial before defense counsel arrived in court. Hence, the majority observes it is analagous to this case where counsel had not yet arrived for the hearing, and so could not lodge an objection.

Setting aside the fact that the Second Department holding in *Margan* is not binding on this Court, the facts, sparse as they are, suggest that the case involved a sole defendant facing a jury trial. It appears, therefore, that the violation occurred under circumstances where there was "no opportunity adequately to cure the prejudice it caused." (*Margan*, 157 AD2d at 70.)

In my opinion, the majority interprets the requirement for counsel's presence at the very moment of deprivation too literally. In fact, the *Narayan* Court's holding was broader in that it

stated that appellate review was not secured "in light of counsel's acquiescence *at a time when correction was possible.*" (54 NY2d at 113 [emphasis added].)

In this case, there is no dispute that defense counsel acquiesced in the court's commencement of the hearing in his absence; he arrived after the hearing had started, and not only failed to object, but apologized and thanked the court as the defendant was called from the public gallery. Nor do I believe there can be any dispute that, upon his arrival, the error was still "susceptible to [an] effective remedy." For example, the court could have asked the court reporter for a readback of the proceeding or restarted the hearing. The hearing was a bench proceeding, and not a jury trial; and the deprivation was confined to 38 pages of transcript out of an eventual 210.* The first witness, who had taken the stand on page 15, was still being questioned by the People when defense counsel arrived on page 53.

I fail to see the relevance of the majority's view that surmising about a remedy is inconsistent with the circumstances in this case because the court was adamant in its refusal to wait for counsel, and therefore an objection would have been futile. It is well established that an objection is made in order to bring the alleged error to the court's attention in order to give the court an *opportunity* to correct it at a point when the error is capable of correction without a vast waste of judicial resources. (*People v Gray*, 86 NY2d 10 [1995].) Certainly, it is not up to defense counsel to make an assessment of how the objection will be received, and what the odds are that the court will agree to correct the alleged error, before deciding whether to object at all. This would turn the preservation requirement into nothing more than a mental exercise for defense counsel, necessarily leading to the appellate argument of, "well I thought about it, but . . . ."

In any event, even if I was inclined to review the issue in the interest of justice, nevertheless, I would decline to remand for a de novo hearing. In my opinion, what transpired after defense counsel's arrival was, in fact, a de novo suppression hearing, notwithstanding that it occurred without defense counsel raising any objection.

The People's argument that the defendant was "unrepresented for only a small portion of the cumulative testimony"

---

* Because there is no way to assess how many minutes elapsed before defense counsel's arrival in court, the standard measurement here will be in transcript pages. The first witness was called on page 15. Defense counsel arrived on page 53; hence defense counsel missed 38 pages of court proceeding.

misses the point. Precedent renders it impermissible to calculate whether presence of counsel would have changed the result *of the proceeding*. (*See Wardlaw*, 6 NY3d at 559.) In my opinion, a more significant finding, upon a careful review of the record, is that the defendant was not unrepresented for testimony appertaining to him.

The People, with the court's permission, refrained from asking any specific questions appertaining to the defendant during defense counsel's absence. Any information imparted about defendant as a result of questions asked about codefendant Reyes was repeated after defense counsel's arrival.

On page 25, after asking Special Agent Forget some general questions about surveillance, wiretap investigations and drug organizations, the People began a line of questioning about the night of the arrests. Thus, the People elicited answers as to who was arrested from the black Jeep (Jose Concepcion, Reyes, and the defendant) and what property was recovered from the Jeep (five cell phones, bills, parking ticket, set of keys, automobile insurance and registration in the name of defendant's wife.) Of the five cell phones seized, one belonged to Concepcion and was the phone that was intercepted by the task force on the way to the drug transaction.

On page 45, the People elicited a series of answers establishing that the task force had never intercepted defendant on a wiretap call, and had never identified defendant prior to his arrest. Only one answer (to the question do you see any of the defendants arrested on April 6th?) resulted in a positive identification of the defendant in the courtroom. On page 46, the prosecutor asked the court if she could "skip just the Huntley with respect to [the defendant] at this point because [defense counsel] is not here?"

Defense counsel arrived on page 53. On page 68, with Special Agent Forget still being questioned, the prosecutor returned to earlier testimony, stating: "I'm going to go back through and ask you now that [defense counsel] has joined us some questions with respect to [the defendant]."

Whereupon, the People elicited for a second time the circumstances surrounding the arrest of the defendant (he was the driver of the Jeep carrying codefendants Jose Concepcion and Reyes); for the second time the People established that the Jeep the defendant was driving was registered to his wife. The People then repeated the questions as to whether defendant had ever been intercepted over a wiretap, or identified as a member of the drug organization prior to the night of the arrest. Then, the People for the first time asked about the statement that defend-

ant had made to Forget. According to the testimony, the defendant had acknowledged he was driving the Jeep, and said that he was on his way to a strip club.

On page 72, when Reyes's attorney interjected to inquire about the report the witness was using to refresh his recollection as to defendant's statement, the court commented to Reyes's attorney: "this has no bearing on your client . . . if I were to compartmentalize it, this is a Huntley hearing for [the defendant]." On page 74, codefendant Reyes's attorney commenced cross-examination of Forget. The cross-examination returned to statements that Forget had made in defense counsel's absence about experience, training and his responsibilities as lead investigator.

On page 137, defense counsel commenced his cross-examination of the special agent by stating: "I represent Mr. Strothers . . . I know I came in late. Sorry about that. I'll try not to reiterate too much." Whereupon, he too asked about Forget's experience and expertise; he also established, as the People had already done, that prior to the arrest, the defendant was not under surveillance, and that his cell phone had not been tapped. Defense counsel also established that there had been no surveillance of the Jeep, and no one had run the license plates of the Jeep; that there were no drugs or massive bundles of cash recovered from the Jeep, and that "in sum and substance, [the defendant] was arrested because he was the driver of the black Jeep."

To the extent that the defendant's position at the hearing, at trial and on appeal, is that the police had no probable cause *to arrest* him *after the stop* of the Jeep based merely on his presence at the scene, the testimony relating to that was fully reiterated at the hearing and defense counsel had full opportunity to cross-examine on it.

Defense counsel did not raise any objection to the commencement of proceedings at the end of the hearing, nor did he claim that the defendant had been prejudiced in any way. Nor did he revisit the issue subsequently at trial. In my opinion, the People rely correctly on *People v Dekle* (56 NY2d 835 [1982]), to assert that allowing the defendant to raise the issue now, two years after trial would "encourage gamesmanship and waste judicial resources." (56 NY2d at 837.)

Finally, the defendant is not entitled to a de novo hearing because the alleged deprivation of counsel was harmless error. In my opinion, it is beyond reasonable doubt that the outcome of the suppression hearing did not contribute to defendant's conviction. A harmless error analysis requires us to assume ar-

guendo that had defense counsel been present from the beginning of the hearing, the challenged evidence and statement would have been suppressed. (*See Wardlaw*, 6 NY3d at 559-560.) The defendant argues that without the personal property seized from him and his Jeep, that is, his cell phone and $2,220 in cash, there was nothing to link him to Jose Concepcion, the drug kingpin, or to the drug organization and the transaction other than that he was driving the Jeep on the night of his arrest.

The majority agrees, observing that the evidence subsequently seized lawfully from Jose Concepcion's house on the day of the arrests, and lawfully obtained phone company records is not sufficient to link the defendant to the drug transaction. That evidence included phone company records for a non-intercepted cell phone belonging to Jose Concepcion, and his American Express bill. The non-intercepted cell phone showed the defendant as a phone contact while the American Express bill showed that Concepcion had purchased two round-trip tickets to Orlando, Florida for himself and the defendant. The majority's view is that this circumstantial evidence is not sufficient because "the facts that defendant traveled with Concepcion and had multiple conversations with him do not, by themselves, establish [defendant's] participation [in the drug transaction]." This glosses over a few additional, salient facts that were established at trial. For example, "multiple" in this case meant more than 330 conversations between Concepcion and the defendant over a two-month period; *more than 120* of these calls were placed in the *two weeks* before the wiretap investigation led the task force to seize $1.4 million destined for an earlier drug transaction in Rockland County. On the *day* of the February seizure there were *21 calls* between Concepcion and the defendant. It is possible that defendant and Concepcion were merely chatting about sports, or politics, or religion, but common sense precludes such a finding where the evidence proffered at defendant's trial established that Concepcion was a drug kingpin involved in multimillion dollar drug transactions; and that he owned and used multiple cell phones because of the nature of his business. I am persuaded by the People's assertion that the sheer volume of calls and their timing point to a business relationship between the defendant and Concepcion. Moreover, the round-trip to Orlando was more than just "defendant traveling with Concepcion." Evidence proffered by the People at trial established that Concepcion then drove from Orlando to Houston, Texas, to meet with his cocaine supplier and to settle an outstanding payment on his portion of the $1.4 million seized in February in Rockland County. Again, phone company records

established frequent calls between Concepcion and the defendant before and after the road trip, but essentially no phone contact between them during the trip. This, together with proof that Concepcion's rental car was driven more than 2,000 miles in three days, could lead to a rational conclusion by the jury that the defendant drove with the drug kingpin to meet the drug supplier.

The majority's observation that it is possible to infer that defendant and Concepcion had a business relationship, but that the circumstantial evidence here does not exclude to a moral certainty the possibility that defendant was not a participant in the drug transaction at which he was arrested, is incomprehensible. In my view, the People did not need the cell phones found in the Jeep, or the fact that the defendant had $2,220 in cash in his pocket to prove beyond a reasonable doubt that the defendant was knowingly involved in the drug transaction on the night he was arrested.

For all the foregoing reasons, I would affirm the defendant's conviction without remanding for a de novo suppression hearing.